N. S. WOLFE, ADMINISTRATOR OF E. R. WOLFE, DECEASED, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 22 October, 1930.)

1. **Master and Servant E a—Where it is admitted that deceased was engaged in interstate commerce the Federal Act and decisions apply.**

    Where in an action in the State court against a railroad it is admitted that the plaintiff's intestate was engaged in interstate commerce at the time of his fatal injury, the liability of the defendant will be determined by the Federal Employers' Liability Act as construed and applied by the courts of the United States.

2. **Master and Servant E b—In this case held: Evidence disclosed no negligence on part of defendant and nonsuit was proper.**

    Where in an action under the Federal Employers' Liability Act the evidence discloses that the plaintiff's intestate was an experienced switchman, and was applying brakes to cars which had been shunted by the

defendant's shifting·engine, and that before the cars upon which he was riding had been stopped they were hit by other cars shunted on the same track for the purpose of making up a train, and that the force of the impact knocked the plaintiff's intestate off the cars and killed him, with further evidence disclosing without contradiction that the shifting was done in the usual way according to the customary method, and there is no evidence of any unusual jerking or unexpected ·movement of cars, or· that defendant's employees knew or had reason to believe that plaintiff's intestate was oblivious to the usual hazards is *held:* insufficient to take the case to the jury, and judgment as of nonsuit was properly entered.

CLARKSON, J., dissenting.

CIVIL ACTION, before *Moore, Special Judge,* at April Term, 1930, of EDGECOMBE.

The evidence tended to show that the deceased, E. R. Wolfe, was an experienced switchman for the defendant, having entered the switching service in 1917. On or about 6 December, 1924, the defendant was switching cars for the purpose of making up a freight train on its yards in South Rocky Mount. The defendant's shifting engine had shunted or kicked a string of two or three cars on one of the tracks, and the deceased was on the rear end of these cars putting on brakes. Before these cars were stopped the defendant shunted or kicked another string of cars upon the same track. The second string of cars so kicked in struck the first string upon which plaintiff's intestate was riding, knocking him off and killing him.

The only witness who saw the occurrence was a negro preacher named July. His narrative is substantially as follows: "I saw the accident. I saw, possibly, it was two or three cars, I disremember which, but Mr. Wolfe was on the rear end of the cars. The engine had shifted these cars on one of the tracks. . . . When the engine shifted them in it left the cars running, and the engine cut loose. Mr. Wolfe was up there putting on brakes, whensoever they shunt the cars in. When I last saw him other cars came in and struck the cars he was on before he got them finally stopped. The engine shoved these cars in or kicked them in, but the engine was cut loose from them before they stopped rolling. The last cars struck the one on which Mr. Wolfe was on and knocked him off. . . . Mr. Wolfe was on the cars that were first put in with his brake stick turning the brake wheel when the second cars were run on him. I did not hear any notice given to him of their approach. . . . If the engineer and conductor on the shifting train had been looking, there was nothing to keep them from seeing Mr. Wolfe. . . . The string of cars upon which Mr. Wolfe was trying to stop were still rolling when the second string of cars was kicked in upon the track. He had checked the speed of the first cars, but they had not fully stopped. That is done on the yards every day. That is

the way they make up a train. There was nothing unusual in what happened except that he fell off. That happens every day. The cars that were rolled into that track were to be coupled unto the cars he was on. They were part of the same train, made up in the same train, and put in there for the purpose of making up the train. When they came in behind the cars he was on they rolled up there and struck the car he was on. That happens dozens of times in making up trains. It is a common everyday thing. Nothing unusual about it. It happens that way usually down there."

The record contains this entry: "It was admitted by both sides that plaintiff's intestate was engaged in interstate commerce and was under the provisions of the Federal Employers' Liability Act."

At the conclusion of plaintiff's evidence the defendant moved for judgment of nonsuit, which motion was allowed by the court.

From the judgment so rendered the plaintiff appealed.

*R. T. Fountain, Thomas J. Pearsall and George M. Fountain for plaintiff.*

*Spruill & Spruill for defendant.*

BROGDEN, J. It having been admitted that plaintiff's intestate was engaged in interstate commerce at the time of his death, it necessarily follows that the liability of the defendant must be determined solely by the Federal Employers' Liability Act as construed and applied by the courts of the United States. The rules of liability declared by the Federal Courts of last resort, relating to injury sustained by brakemen and others while at work around and upon shifting trains and shunted cars, are discussed and applied in many cases, notably: *C. & M. and S. T. P. Ry. v. Coogan,* 271 U. S., 472; *Gulf, Mobile and Northern R. R. Co. v. Wells,* 275 U. S., 455; *Toledo, St. Louis & Western R. Co. v. Allen,* 276 U. S., 165; *Delaware L. & W. R. Co. v. Koske,* 279 U. S., 7; *Chesapeake & Ohio R. R. Co. v. Mihas,* 50 Supreme Court Reporter, 42; *Slocum v. Erie R. R. Co.,* 37 Fed. (2d), 42.

In the *Toledo case, supra,* a car checker was injured by a shunted car. In discussing the merits of the question the Supreme Court of the United States said: "The work of checking cars in a yard at night where switching is being done is necessarily attended by much danger. But fault or negligence may not be inferred from the mere existence of danger or from the fact that plaintiff was struck and injured by the moving car. . . . On the evidence it must be held that he knew how switching was done there; and, in the absence of proof that he was exposed to some unusual danger by reason of a departure from the practice generally followed, it cannot be held that defendant was in

duty bound to give him warning. . . . There is nothing to sustain a finding that plaintiff was in any danger other than such as was usually incident to his employment or that any member of the crew knew or had any reason to believe that he was oblivious of the situation. In the absence of knowledge on their part that he was in a place where he was liable to be struck and oblivious of that danger, they were not required to vary the switching practice customarily followed in that yard or to warn or to take other steps to protect him."

In the *Mihas case, supra,* the plaintiff was employed to care for switch lights and lamps along the right of way. In the line of his duty he attempted to climb over a coal car standing on a switch track. While doing so, a string of nine cars was forcibly propelled by means of a flying switch against the standing cars with such force that the plaintiff was knocked off and severely injured. The Court said: "There is nothing in the record to show that employees engaged in the switching operation knew or had reason to believe that Mihas was in any position of danger. In the absence of such knowledge or ground for belief they were not required to warn him of the impending switching operation or to take other steps to protect him."

The plaintiff in the *Slocum case, supra,* was a switchman and was knocked off a car during a switching operation and killed. Recovery was permitted in the State court upon the theory that he was knocked off by the impact of shunted cars. The Circuit Court of Appeals for the Second Circuit, in denying the right of plaintiff to recover, declared: "There must be proof of some unusual jar, and this was altogether lacking in the present case."

Applying the principles of law to the facts, it is manifest that the switching operation involved in the case at bar was done in the usual and customary manner and according to the usual practice established in the yards of defendant at Rocky Mount. The plaintiff's intestate, as a switchman of twelve years experience, must have been thoroughly cognizant of the usual and customary practice in such operations and aware of all the usual hazards incident to his employment. The evidence discloses, without contradiction, that the switching was done in the usual way, according to the customary method, and that there was no departure from the usual practice in making up the train. Moreover, there was no evidence of any unusual jerking or unexpected movement of cars, nor is there evidence that the employees of defendant knew or had reason to believe that plaintiff's intestate was oblivious to the hazards and dangers which surrounded him.

Under such circumstances the Federal Law denies recovery, and the judgment of nonsuit was properly entered.

Affirmed.

CLARKSON, J., dissenting: Taking the entire evidence of J. A. July, witness for plaintiff, I think it was sufficient to be submitted to the jury.

In *Shell v. Roseman,* 155 N. C., at p. 94, we find: "We are not inadvertent to the fact that the plaintiff made a statement on cross-examination as to a material matter, apparently in conflict with his evidence when examined in chief, but this affected his credibility only, and did not justify withdrawing his evidence from the jury. *Ward v. Mfg. Co.,* 123 N. C., 252."

E. R. Wolfe was a switchman, working for defendant. July testified, in part: "It was a shifting engine shifting cars on these spur tracks that I have just described. I remember the day Mr. E. R. Wolfe was killed and run over. I saw the accident. I saw possibly it was two or three cars, I disremember which, but Mr. Wolfe was on the rear end of the cars. The engine had shifted these cars on one of the tracks, like track 10, as well as I can remember. When the engine shifted them in it left the cars running, the engine cut loose. Mr. Wolfe was up there putting on brakes, whensoever they shunt the cars in. When I last seen him there come in other cars and struck the cars he was on before he got these finally stopped. The engine shoved these cars in, what I call kicked in, but the engine was cut loose from them before they stopped rolling. These last cars struck the one on which Mr. Wolfe was on and knocked him off. . . . When Mr. Wolfe was on the cars that were first put in with his brake stick turning the brake wheel, when the second cars were run in on him I didn't hear no notice given to him of their approach. The cars passed by me where I worked. They passed by where I was. . . . Q. Was there anything, if the engineer and conductor on the shifting train had been looking, was there anything to keep them from seeing Mr. Wolfe? A. Nothing as I know of. I don't have any opinion as to the rate of speed the first cars were going when they were shunted in there. They were going good and swift. The second lot of cars come in about the same speed. The engine left these first ones going there. . . . Three or four minutes the cars had been rolling away from the ladder before the other cars came in there and struck against it, but I couldn't say definitely how many minutes it was. I couldn't give you exactly the speed of them, but rolling pretty good and swift. When the engine kicked them in there I suppose they might have been going eight or ten miles an hour. Passed me rolling about that speed. The first ones had slowed down some. When they passed me they were not going eight or ten miles an hour. The last ones were kicked in there. When they were first kicked in there they were making about that speed. I said up on the end, just about where the engine cut loose from them they were going eight or ten miles an hour. . . . I stated that when the first cars were shunted in they

WOLFE v. R. R.

were shunted in about ten miles an hour and gradually slowed down. The brakeman, Mr. Wolfe, slowed these cars down. When the second group of cars came in no brakeman or switchman was on the cars. The speed on them had not slackened before it struck the car Mr. Wolfe was on."

E. R. Wolfe's wife testified: "At the time of his death his salary was around two hundred dollars a month. He was an economical man and provided well for his family. At his death he didn't leave any estate but a home, and it was not paid for."

Here we have a man, without any fault on his part, killed at his post of duty, leaving a wife and family practically penniless. The evidence shows that Wolfe was on the rear end of the cars, which had been shunted or kicked into a spur track, with the engine cut loose, putting on brakes to stop the shunted or kicked cars, with his brake stick turning the brake wheel. Before these cars were stopped, the engineer, without notice to Wolfe or any warning to him, kicked or shunted other cars on the same track "rolling pretty good and swift." The first cars shunted in had slowed down when Wolfe was putting on the brakes. The cars that were then kicked on the same track had no brakeman and the speed had not slackened before they struck the car Wolfe was on, nor was warning given by the engineer by ringing a bell or blowing a whistle. The impact was so severe that Wolfe was knocked from his post of duty and killed. "His body was badly cut up." A reasonable inference from the fact that Wolfe was knocked off by the impact, is that the jar was unusual and further that he had no notice. When the engineer kicked in the second lot of cars, which were going "good and swift," how easily the engineer could have given warning to Wolfe, by ringing the bell or blowing the whistle. Wolfe was suddenly, without notice, hurled to the ground and killed.

I think this action is governed by the principle set forth in Chicago R. I. & P. R. Co. v. Ward, 252 U. S., 18, 64 Law Ed., 431: "Applying the principles settled by these decisions to the facts of this case, the testimony shows that Ward had neither warning nor opportunity to judge of the danger to which he was exposed by the failure of the engine foreman to cut off the cars. In the absence of notice to the contrary, and the record shows none, Ward had the right to act upon the belief that the usual method would be followed and the cars cut off at the proper time by the engine foreman, so that he might safely proceed to perform his duty as a switchman by setting the brake to check the cars which should have been detached. *For the lack of proper care on the part of the representative of the railway company while Ward was in the performance of his duty, he was suddenly precipitated from the front end of the car by the abrupt checking resulting from the failure to make the disconnection.* This situation did not make the doctrine of assumed

risk a defense to an action for damages because of the negligent manner of operation which resulted in Ward's injury, and the part of the charge complained of, though inaccurate, could have worked no harm to the petitioners. *It was a sudden emergency, brought about by the negligent operation of that particular cut of cars,* and not a condition of danger, resulting from the master's or his representatives' negligence, so obvious that an ordinarily prudent person in the situation in which Ward was placed, had opportunity to know and appreciate it, and thereby assume the risk." (Italics mine.)

The fact that the witness, July, testified on cross-examination, "That is the way they make up a train. There was nothing unusual in what happened except that he fell off," etc. Such statement did not negative the statement theretofore made in regard to this particular occurrence. The entire evidence was for the jury.

It will be noted that this is not a railroad yard case, as are the cases cited in the main opinion. See *Candler v. R. R.,* 197 N. C., 399. The *Slocum case* seems to be predicated mainly on the following in the opinion: "In the first place, all the testimony indicates that Slocum fell from the car on which he was riding, through some unknown cause, long before the engineer closed the throttle and put in the slack. Therefore, even if Delaney had stayed on duty and had uncoupled the engine, and if the fireman had remained in the cab so as to give Slocum a slacking signal, the accident would not have been avoided. Whatever may have been the cause of Slocum's death, it was not the neglect to give a slacking signal, because he evidently fell before any vibration from putting in the slack could have occurred."

The most recent case—a yard case—is *Atchison T. & S. F. Ry. Co. v. Toops,* 50 Sup. Ct. Rep., p. 281, decided 14 April, 1930. In that case there were no eye witnesses to the accident. Decedent was a conductor in charge of the railroad freight train. Under the rules of the railroad, the conductor was required personally to make the switching movement. At p. 283, it is said: "What actually took place can only be surmised. Whether he was run down on the track by the first car, or he attempted unsuccessfully to board the train on one side or the other or succeeded, and in either case finally came to his death by falling under or between the moving cars is a matter of guesswork."

The positive evidence in this case is that the shunted or kicked cars that struck the car where plaintiff's intestate was putting on brakes, knocked him off. It is not contended by defendant that E. R. Wolfe was negligent or in fault. He was on the top of the car with his brake stick turning the brake wheel, in the performance of duty, to stop the cars; without warning the impact of the shunted or kicked cars was so unusual and severe a "jar or jolt" that he was thrown to the ground and killed.

The plea of defendant is assumption of risk. The burden of this issue is on defendant. The fact was for the jury to determine and not this Court.

This is a hard case. Here one, admittedly in the performance of duty, a bread-winner, at his post of duty, is thrown from his place of work by shunted or kicked cars, without warning, no bell rung, whistle blown or brakeman on the shunted or kicked cars to give warning, the impact so severe as to hurl him from his place of safety to death. This faithful servant, without fault on his part, leaves a wife and family penniless. It is for the jury to say if he assumed such a risk as that which took his life. I think the evidence sufficient to be submitted to a jury.